UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
EDGAR SANCHEZ,

                               Plaintiff,

     -against-

EZ PARKING CORPORATION, EK PREMIER
SERVICES LLC, and YAN MOSHE, individually,

                              Defendants.
------------------------------------------X

Case No.: 1:23-cv-4052 (AMD) (VMS)

**PLAINTIFF'S RESPONSE TO EK PREMIER'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

       Plaintiff, by his attorneys, the Law Offices of Vincent E. Bauer, pursuant to Rule 56 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") and Rules 7.1 and 56.1 of the Local Rules for the Eastern District of New York (hereinafter "Local Rule" or "LCR"), hereby responds to EK Premier's Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment as to which EK Premier contends that there are no genuine issue to be tried.

      1. 6336 99th Street, Rego Park, NY 11374 (the "Building") houses a condominium building with commercial and residential units as well as a parking garage; it is not located in a tourist destination and is surrounded mostly by apartment buildings. Sanchez Dep. 150:18-24.[1]

      **Response: Disputed.**

      Defendant states that the building is located in a non-tourist, residential and commercial area. However, Plaintiff testified that vehicles with out-of-state license plates regularly used the parking garage. Plaintiff observed cars from Pennsylvania and New Jersey driven by individuals visiting family members who lived in the building (Sanchez Dep. 71:12–16, 72:2–3). Plaintiff disputes any implication that the garage's location precluded use by interstate patrons or that its operations were strictly local.

1

2. EZ Parking Corporation ("EZ Parking") was a domestic business corporation organized under the laws of the State of New York and is authorized to do business in the State of New York. See Declaration of Emanuel Kalendarev ("Kalendarev Decl.") ¶ 3.

**Response:** Not disputed.

3. EZ Parking operated a parking garage and did business as EZ Parking prior to March 2021. Kalendarev Decl. ¶ 4.

**Response:** Not disputed.

4. Roman Yunusov ("Roman") was the sole owner, member, and operator of EZ Parking, which leased the parking garage at the Building prior to March 2021. Kalendarev Dep. 14:1-22.[2]

**Response:** Disputed.

Defendant Emanuil Kalendarev testified that Roman Yunusov was the sole owner and operator of EZ Parking prior to March 2021 (Kalendarev Dep. 14:1–22). That testimony is hearsay. Plaintiff does not have personal knowledge of Roman's legal or ownership status. Plaintiff testified that during this period, he was repeatedly informed that Moshe to be the owner of the business, and that Roman was an employee working under Moshe's authority (Sanchez Dep. 136:23–24). Plaintiff disputes any implication that Roman alone controlled or operated the garage without involvement from Yan Moshe.

5. Emanuil Kalendarev ("Emanuel") owns Rego Park Seniors Club which operates at the Building since in or about 2016 and caters to the elderly and underprivileged people with emotional, mental, and physical problems. Kalendarev Dep. 8:12-9:16.

**Response:** Not disputed.

6. EK Premier is a limited liability company organized under the laws of the State of New York and is authorized to do business in the State of New York. Kalendarev Dep. 19:9-20:3.

**Response:** Not disputed.

2

7. Emanuel was the sole owner and member of EK Premier, which was a company created for valet parking services in 2021. Kalendarev Dep. 10:17-11:3, 19:24-20:1, 83:6-7, 122:22-25.

**Response:** **Not disputed.**

8. EK Premier operated a parking garage and did business as EK Premier Services LLC since in or about March 2021. Kalendarev Dep. 21:2-5.

**Response: Not disputed.**

9. Plaintiff Edgar Sanchez ("Sanchez") worked at EZ Parking when Emanuel sought to take over the lease, and Sanchez introduced himself to Emanuel as the manager of the parking garage. Kalendarev Dep. 14:23-16:17.

**Response: Disputed.**

Defendant Emanuil Kalendarev testified that Plaintiff told him he was "the manager of the garage" when they first met (Kalendarev Dep. 14:23–16:17). However, Plaintiff testified that it was Kalendarev who told Plaintiff he would be "in charge of the garage," and that Moshe was the owner (Sanchez Dep. 91:15–18,172:19-23). Plaintiff disputes any implication that he introduced himself as the manager or held a managerial position.

10. Emanuil was the manager of the restaurant called Millenium in the building before he obtained a lease for the parking garage. Sanchez Dep. 91:6-9.

**Response: Disputed in part, and in no way material.**

Plaintiff testified that prior to his involvement at the parking garage, Defendant Emanuil Kalendarev managed a restaurant in the building called Millenium (Sanchez Dep. 91:6–9). Plaintiff did not testify that Kalendarev "obtained a lease" for the parking garage.

3

11. Prior to his taking over the lease for the parking garage through EK Premier, Emanuel did not have any control, oversight, or direction over EZ Parking; he only parked his vehicle at the parking garage. Sanchez Dep. 136:7-14.

**Response: Not disputed.**

12. Sanchez first began working with Emanuel in March 2021. Sanchez Dep. 92:13-15.

**Response: Not disputed.**

13. Sanchez would discuss pay with Emanuel. Sanchez Dep. 92:19-22.

**Response: Not disputed.**

14. Yan Moshe ("Moshe") was the landlord of the building that EZ Parking and EK Premier rented space from. Kalendarev Dep. 11:4-6, 15:15-16:14, 17:18-19:8.

**Response: Not disputed.**

15. Sanchez arrived to the United States in May 2009. Sanchez Dep. 20:13-17.

**Response: Not disputed.**

16. Before working at the parking garage that is the subject of this case, Sanchez worked at a supermarket; he continued working at the supermarket while working at the parking garage. Sanchez Dep. 33:23-34:13.

**Response: Disputed in part.**

Plaintiff testified that he worked at a supermarket before starting at the parking garage and that he continued working there for a brief period, after beginning his job at the garage (Sanchez Dep. 33:23–34:14).

17. Sanchez is no stranger to being in business for himself; he had a side gig selling products from Manhattan at flea markets on Long Island on Sundays. Sanchez Dep. 93:12-21.

**Response: Not disputed but also not material.**

4

Plaintiff testified that he occasionally sold merchandise at flea markets on Sundays (Sanchez Dep. 93:12–21). However, this was a personal side activity, unrelated to his employment at the garage, and has no bearing on whether he was an employee under the FLSA or NYLL.

18. He currently works as a driving instructor where he decides his schedule. <u>Sanchez Dep. 19:13-20, 41:9-23, 42:8-14, 42:21-43:15, 102:22-103:3.</u>

**<u>Response</u>: Not disputed but not material.**

Plaintiff's current role as a driving instructor has no bearing on whether he was an employee under the FLSA or NYLL during his prior employment at the parking garage.

19. Sanchez was initially paid at $8.50 or $9.00 per hour on a weekly basis at the parking garage. <u>Sanchez Dep. 37:14-25.</u>

**<u>Response</u>: Not disputed.**

20. Sanchez never signed any new hire paperwork at the parking garage. <u>Sanchez Dep. 98:3-8, 102:13-16.</u>

**<u>Response</u>: Not disputed**

21. Sanchez did not receive any employment benefits such as paid vacation or any commission. <u>Sanchez Dep. 102:3-12.</u>

**<u>Response</u>: Disputed in part.**

Plaintiff testified that he did not receive paid vacation or commissions while working at the garage (Sanchez Dep. 102:3–12). However, Plaintiff testified that he specifically requested vacation pay from Defendant Kalendarev, who acknowledged the request (Sanchez Dep. 190:4–5, 190:15–17).

22. In the beginning, Sanchez was paid solely by check after receiving pay in cash for approximately ten (10) days; later on, he was paid for forty (40) hours by check and the remainder in cash. Sanchez Dep. 38:2-8, 38:20-25, 39:11-22, 85:23-86:6.

**Response**: **Not disputed.**

23. When he was first hired, Sanchez was informed that he was being given the opportunity to manage this new garage. Sanchez Dep. 45:11-46:8.

**Response: Disputed.**

Plaintiff testified that Cesar, the person who hired him, stated that he, not Plaintiff, had been given the opportunity to manage the new garage (Sanchez Dep. 45:24–46:8). Plaintiff did not testify that he was offered a managerial role.

24. From the beginning of his engagement with the parking garage, Sanchez worked with Cesar and Roman until March 2021. Sanchez Dep. 48:8-22.

**Response**: **Not disputed.**

25. Roman informed Sanchez that he trusts him to do the right thing in managing the parking garage. Sanchez Dep. 50:9-18.

**Disputed.**

Plaintiff testified that Roman introduced himself as the new manager and said he would come in the afternoon to supervise. Roman made a general comment that he trusted the workers "to do the right thing," but did not assign managerial or supervisory duties to Plaintiff (Sanchez Dep. 50:9–18).

26. At the time Roman came along to replace Cesar, the name of the parking garage changed from CMJ Parking to EZ Parking. Sanchez Dep. 53:6-13.

**Response: Disputed in part.**

6

Plaintiff testified that the parking garage was initially called CMG Parking and that the name later changed to EZ Parking, but did not state that the name change occurred at the time Roman replaced Cesar (Sanchez Dep. 53:6–13).

27.     Sanchez complained that he was not being properly [ s i c - p a i d ] ever since Roman replaced Cesar. Sanchez Dep. 53:16-54:2, 62:7-19, 88:8-17.

**Response:** **Disputed in part.**

Plaintiff understands the statement to refer to complaints about improper pay, though the sentence is incomplete. Plaintiff testified that his hourly wage under Roman increased to $12 per hour, and he began complaining only after the state minimum wage increased and Roman failed to raise his pay accordingly (Sanchez Dep. 88:13–17). Plaintiff disputes any implication that complaints began immediately upon Roman's arrival or that they were continuous "ever since" he replaced Cesar.

28.     At all relevant times, Roman set Sanchez's schedule, method and timing of payment, and would give Sanchez his pay. Sanchez Dep. 56:17-57:5.

**Response:** **Disputed in part.**

Plaintiff testified that Roman determined his schedule, method of payment, and physically handed him both cash and paystubs only during the period of Roman's management (Sanchez Dep. 56:19–57:5). However, this was not for the entire period of Plaintiff's employment. Plaintiff also testified that Roman was eventually replaced by Emanuil Kalendarev, who was sent by the owner, Yan Moshe, to take over management of the garage. (Sanchez Dep. 89:8–16). Sanchez further testified that Emanuil was "there all the time," unlike Roman, and that he interacted with Emanuil regularly while working. (Sanchez Dep. 91:23–92:2).

In addition, Emanuil Kalendarev testified that he began managing the garage in early 2021. (Kalendarev Dep. 22:2–5). He further testified that he paid Sanchez a weekly salary of $1,080. (Kalendarev Dep.

7

85:8–10). Therefore, Defendants' assertion that Roman controlled Plaintiff's pay and schedule "at all relevant times" is materially inaccurate.

29. Sanchez mostly worked nights when he first started working at the garage, while another individual named Carlos worked during the day. Sanchez Dep. 58:17-18, 57:15-58:2, 58:20-23, 68:22-70:4.

**Response:** **Not disputed**

30. The patrons of the parking garage were local residents or employees of the building, which included a therapy business, CitiMed, Millenium restaurant, and a synagogue. Sanchez Dep. 64:3- 65:15.

**Response:** **Disputed in part.**

Plaintiff testified that some patrons were local residents or building employees, including those visiting businesses such as CitiMed, Millennium restaurant, and a synagogue (Sanchez Dep. 64:3–65:11). However, Plaintiff also testified that customers regularly came from out of state, including New Jersey, Pennsylvania, and Connecticut to visit family or attend medical appointments (Sanchez Dep. 64:13–16; 71:12–16; 72:2–3; 75:14–23). Patrons also parked at the garage to attend nearby events.

31. Sometimes, patrons of the parking garage came in vehicles with out-of-state license plates. Id; Sanchez Dep. 70:5-17, 71:14-16, 71:23-72:3, 75:3-4, 148:23-25.

**Response:** **Disputed in part.**

Plaintiff disputes any implication that this occurred only occasionally. He testified that vehicles from out of state arrived as often as daily and that drivers often told him they were in town for therapy, family visits, or events at the building (Sanchez Dep. 71: 23–25 - 72:1–3).

32. Sanchez's regular shift would be from 7:00 PM to 7:00 AM. Sanchez Dep. 68:16-21.

**Response:** **Not disputed.**

33. Sanchez was paid $12.00 per hour since in or about 2013 or 2015, partly in cash and partly by check. Sanchez Dep. 79:25-80:13, 128:16-18, 140:25-141:5.

**Response: Disputed in part.**

Plaintiff testified that he began receiving $12.00 per hour around 2014 or 2015, not in 2013, and that he was paid partly in cash and partly by check (Sanchez Dep. 128:16–18, 140:25–141:5).

34. Sanchez received $480.00 by check for forty (40) hours of work, plus approximately $500.00 or more in cash, with $1,008.00 per week being the normal pay for a full week of work. Sanchez Dep. 127:3-9, 128:15, 145:5-146:4; Kalendarev Dep. 16:18-25 ($1,080.00), 28:20-24 (same), 86:7- 14 ("Our agreement with him was he was the manager of the space. Whether he was working or somebody covered him, he wanted $1,080 a week"), 111:13-112:15 (same).

**Response: Disputed**

Plaintiff testified that he received $480 by check for 40 hours of work and the remainder in cash, totaling approximately $1,008 per week when he worked a full 84-hour week (Sanchez Dep. 127:3–12, 128:12-15). He testified that when he missed work, he was not paid, and the replacement was paid directly by EK Premier (Sanchez Dep. 187:16–23).

Defendant Kalendarev confirmed that when Plaintiff was absent, the company paid the replacement directly and deducted that amount from Plaintiff's weekly payment (Kalendarev Dep. 39:21–40:3)

35. The parking garage had approximately eighty (80) total spots and he would park approximately thirty to forty (30-40) cars per day. Sanchez Dep. 70:18-71:11.

**Response: Disputed in part.**

Plaintiff testified to parking 30-40 cars in connection with daily parking, but also testified about monthly cars coming in and out of the subject garage. Sanchez Dep. 70:18-71:11.

9

36. The price for monthly parkers was $350 per month (except for ten spots at $175.00 per month for doctors with offices in the building), but Teslas were charged $450 per month, and there were ten (10) Teslas. Sanchez Dep. 85:12-18, 154:5-7, 154:12-18.

**Response: Disputed in part.**

Plaintiff testified that monthly rates included $350 for most patrons, $175 for ten doctors, and $450 for approximately ten Teslas (Sanchez Dep. 85:12–18, 154:5–7, 154:12–18). However, Plaintiff also testified that daily parking occurred regularly, especially on weekends and holidays, generating additional revenue not reflected in this summary (Sanchez Dep. 85:19-24, 86:18-87:5).

37. As for daily parkers, they were charged $8.00 for up to two (2) hours and $18.00 for the entire day. Sanchez Dep. 85:19-86:2.

**Response: Not disputed.**

38. Customers paid equally between cash and check for parking. Sanchez Dep. 104:14-21.

**Response: Disputed.**

Plaintiff testified that he was paid in both cash and check, but did not testify to being paid in equal amounts for each.

39. Sanchez's duties including receiving cars, parking them, being aware of their location, taking care of the garage, charging people for parking, collect all monies, and close the register. Sanchez Dep. 76:7-13, 76:17-21.

**Response: Not disputed.**

40. When Sanchez did not want to work, went on vacation, or otherwise wanted time off for himself, he recruited other people to work for him of his own volition and paid them himself from

10

his own funds.  Sanchez Dep. 77:18-78:23, 79:10-16, 81:25-82:17, 82:24-83:2, 92:9-12, 101:7-21, 103:23-104:6, 187:24-189:5; Kalendarev Dep. 16:25-17:17, 22:6-23:23, 23:9-20, 26:18-27:17, 28:25-29:6, 31:25-32:18, 39:9-40:25, 41:15-43:7, 87:3-16 (discussing consistent patterns of Sanchez utilizing his own employees at the parking garage, especially on weekends).

**Response: Disputed.**

Plaintiff occasionally arranged for others to cover his shift, but these substitutions were made with Defendant's knowledge and approval. Plaintiff testified that he had to inform his manager when he needed time off and confirm the replacement and their pay (Sanchez Dep. 78:20–25, 79:7–16). Defendant Emanuil Kalendarev admitted that EK Premier sometimes paid replacements directly or deducted their pay from Plaintiff's wages, depending on the situation (Kalendarev Dep. 39:21–40:3). Kalendarev further testified that this arrangement was not unique to Plaintiff, Carlos Garcia, who worked the morning shift, was responsible for finding someone to cover his own shift when absent, (Kalendarev Dep. 27:18–21: 28:5-9, 29:10-21).

41.     Roman did not interview the individuals that Sanchez hired, and Sanchez determined who would work based on their driving skills.  Sanchez Dep. 82:18-20, 103:16-22.

**Response: Disputed.**

Plaintiff testified that when he needed someone to temporarily cover his shift, he selected individuals he knew to be responsible and safe drivers, and informed management of who would be working (Sanchez Dep. 82:18–20, 103:16–22). However, Plaintiff did not hire employees, set terms of employment, or control payroll. These were informal coverage arrangements made with Defendant's knowledge and approval. Plaintiff disputes any implication that he exercised hiring authority or held managerial responsibilities.

42.     Sanchez decided when his employees would work.  Sanchez Dep. 83:24-84:7.

**Response: Disputed.**

11

Plaintiff testified that when he could not work a scheduled shift, he would ask someone he trusted to cover for him (Sanchez Dep. 83:24–84:7). Plaintiff did not supervise employees or maintain authority over scheduling. Any such arrangements were limited to his own occasional absences and were made with Defendant's knowledge and approval.

43.  When Emanuel wanted to convert Sanchez to payment only by check, Sanchez adamantly refused because the employees Sanchez hired only wanted cash. Kalendarev Dep. 87:17-88:17.

**Response: Disputed.**

Plaintiff disputes the implication that he had employees or that he directed payment methods. The decision to pay in cash was made and controlled by Defendant. Defendant testified that Garcia, the day shift worker, was also paid partially in cash (Kalendarev Dep. 28:12–25), and that Juan, the individual who replaced Plaintiff after his termination, was similarly paid in cash (Kalendarev Dep. 114:16–24). These admissions demonstrate that cash payments were a regular practice of EK Premier.

44.  Sanchez filed suit to recover the difference between his $12.00 hourly rate and the minimum wage of $15.00. Sanchez Dep. 114:16-115:5, 124:7-14.

**Response:  Disputed in part.**

Plaintiff testified that he filed suit to recover both the difference between his $12.00 hourly rate and the $15.00 minimum wage, and for unpaid overtime (Sanchez Dep. 115:1–5). Plaintiff disputes any implication that this action seeks only minimum wage differential, as his claim also includes unpaid overtime wages.

45.  Sanchez concedes that he did not always work eighty-four (84) hours per week because he had his employees work for him and would call them whenever he wanted a day off. Sanchez Dep.115:6-116:4, 197:12-15; Kalendarev Dep. 118:14-119:1, 120:3-22.

**Response: Disputed.**

12

Plaintiff testified that he worked 84 hours a week and only missed work under extraordinary circumstances (See Sanchez Dep. 115:2-5–116:4, 196: 22-25, 197:1-11).  Defendant was also shown a WhatsApp exchange (D214) between himself and Plaintiff, in which Plaintiff stated he worked 84 hours per week, and Defendant did not dispute this. (Kalendarev Dep. 120:3–14).

46. Cash was not deposited into EK Premier because it went to pay Sanchez and the employee who worked during the day.  Kalendarev Dep. 52:25-54:8.

**Response: Not disputed.**

47. Sanchez stopped working at EK Premier on March 6, 2023.  Sanchez Dep. 129:23-130:2, 193:6-10, 193:15-194:14; Kalendarev Dep. 36:19-23, 73:18-22.

**Response: Not disputed.**

48. Despite working with Roman for a majority of the time he was at the parking garage, Sanchez has no good explanation for why he did not sue Roman.  Sanchez Dep. 156:9-19.

**Response: Disputed.**

Plaintiff testified that he did not file suit against Roman in his individual capacity and did not offer a detailed explanation for that decision (Sanchez Dep. 156:9–19). Plaintiff disputes the characterization that he had "no good explanation," as that is not a factual assertion.

49. In 2021, EK Premier earned gross revenue of $104,040.00. Kalendarev Decl. ¶ 6, Ex. A (D13- D14, D217-D218, D19-D85).

**Disputed:**

EK Premier has produced documents which reflect income that is fraudulent.  In that regard, Emanuel testified that the cash generated by the parking garage was not deposited into EK Premier's bank account, and that therefore those monies are not reflected in EK Premier's bank records. Kalendarev Tr. at p. 174:2–7.  At all relevant times, EK Premier had an annual gross volume of sales in excess of $500,000.  In that regard, Plaintiff, who was directly involved in collecting parking fees from

13

customers, recalls the following concerning EK Premier's revenues: EK Premier stored approximately 70 gas-powered autos on average, at a cost of $350 per month; EK Premier stored an additional approximately 10 Tesla autos on average, at a monthly cost of $450 per month; EK Premier received fees from approximately 10 employees of the medical practice located in the same building as the parking garage, with each paying $175 per month; an additional approximately ten medical practice employees paid $18 per work day for parking; EK Premier also received approximately $400 per day on which nearby events took place, and there were approximately 12 such events per month; approximately 25 medical practice patients each paid EK Premier $18 per day each day; and an additional approximately 28 people parked their cars with EK Premier each day not associated with either events or the medical practice, paying $18 per day. In all, Plaintiff estimates annual revenues for EK Premier at over $600,000 per year. Sanchez Declaration ¶ 5.

50. In 2022, EK Premier earned gross revenue of $129,448.00. <u>Kalendarev Decl. ¶ 7, Ex. B. (D15- D18, D219-D220, D86-D172).</u>

**Disputed:**

EK Premier has produced documents which reflect income that is fraudulent. In that regard, Emanuel testified that the cash generated by the parking garage was not deposited into EK Premier's bank account, and that therefore those monies are not reflected in EK Premier's bank records. Kalendarev Tr. at p. 174:2–7. At all relevant times, EK Premier had an annual gross volume of sales in excess of $500,000. In that regard, Plaintiff, who was directly involved in collecting parking fees from customers, recalls the following concerning EK Premier's revenues: EK Premier stored approximately 70 gas-powered autos on average, at a cost of $350 per month; EK Premier stored an additional approximately 10 Tesla autos on average, at a monthly cost of $450 per month; EK Premier received fees from approximately 10 employees of the medical practice located in the same building as the parking garage, with each paying $175 per month; an additional approximately ten medical practice

14

employees paid $18 per work day for parking; EK Premier also received approximately $400 per day on which nearby events took place, and there were approximately 12 such events per month; approximately 25 medical practice patients each paid EK Premier $18 per day each day; and an additional approximately 28 people parked their cars with EK Premier each day not associated with either events or the medical practice, paying $18 per day. In all, Plaintiff estimates annual revenues for EK Premier at over $600,000 per year. Sanchez Declaration ¶ 5.

51. In 2023, EK Premier earned gross revenue of $46,882.00. Kalendarev Decl. ¶ 8, Ex. C (D221- D222, D173-D194).

**Disputed:**

EK Premier has produced documents which reflect income that is fraudulent. In that regard, Emanuel testified that the cash generated by the parking garage was not deposited into EK Premier's bank account, and that therefore those monies are not reflected in EK Premier's bank records. Kalendarev Tr. at p. 174:2–7. At all relevant times, EK Premier had an annual gross volume of sales in excess of $500,000. In that regard, Plaintiff, who was directly involved in collecting parking fees from customers, recalls the following concerning EK Premier's revenues: EK Premier stored approximately 70 gas-powered autos on average, at a cost of $350 per month; EK Premier stored an additional approximately 10 Tesla autos on average, at a monthly cost of $450 per month; EK Premier received fees from approximately 10 employees of the medical practice located in the same building as the parking garage, with each paying $175 per month; an additional approximately ten medical practice employees paid $18 per work day for parking; EK Premier also received approximately $400 per day on which nearby events took place, and there were approximately 12 such events per month; approximately 25 medical practice patients each paid EK Premier $18 per day each day; and an additional approximately 28 people parked their cars with EK Premier each day not associated with either events

15

or the medical practice, paying $18 per day. In all, Plaintiff estimates annual revenues for EK Premier at over $600,000 per year. Sanchez Declaration ¶ 5.

52. During Sanchez's entire tenure with Kalendarev at EK Premier, Sanchez did not perform any work involving or relating to the movement of persons among the United States of America ("USA") or between any States within the USA. Kalendarev Decl. ¶ 5.

**Disputed:**

At all times relevant to this action, EK Premier was an "enterprise engaged in interstate commerce" within the meaning of the FLSA. In that regard, the parking garage operated by EK Premier involved the parking of automobiles that were, upon information and belief, produced for commerce in states other than New York. EK Premier's parking garage also stored and moved automobiles that were moved from states other than New York to New York by people visiting New York for the day and/or attending events in the state, and vehicles that travelled to New Jersey and Connecticut, among other states. More specifically, Plaintiff noticed license plates on cars parked at the garage which were not New York plates several times per week, and also spoke with friends and relatives of tenants of the building in which the parking lot is located, who informed Plaintiff that they lived in states other than New York. In all, those relatives parked at the garage on average 5-6 times per month. Sanchez Declaration ¶ 7.

Date: April 30, 2025
     New York, NY


                              Vincent E. Bauer, Esq.


                              _____
                              Law Offices of Vincent E. Bauer
                              425 Madison Avenue, 17th Floor
                              New York, NY 10017
                              v.bauer@verizon.net

*Attorneys for Plaintiff*
*Edgar I. Sanchez*